UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

AMJAD ABUDIAB

        Plaintiff,

  v.

CITY AND COUNTY OF SAN FRANCISCO, et al.,

        Defendants.
_____/

CV 09-01778 MHP

**MEMORANDUM & ORDER**

**Re:** Defendants' Motion for Partial Summary Judgment

    Amjad Abudiab ("plaintiff"), a limousine driver, brings this action against the City and County of San Francisco ("City"), Elias Georgopoulos ("Georgopoulos") and Antonio Parra ("Parra"), (collectively "defendants"), alleging assault, battery and violations of civil rights under state and federal law. Before the court is defendants' motion for partial summary judgment. Having considered the parties' submissions and arguments, the court enters the following memorandum and order.

BACKGROUND

I.    <u>Factual Background</u>

    The facts underlying this case were previously recounted by the court in its Memorandum and Order denying defendants' first motion for partial summary judgment. Docket No. 39 (April 12, 2010 Order ("First Order")). These facts are restated below.

    At the time of the events at issue, defendant Elias Georgopoulos was a Senior Parking Control Officer ("PCO") employed by the parking enforcement division of the San Francisco

Municipal Transit Authority. PCOs, such as Georgopoulos, are responsible for issuing citations for illegal parking. There is no dispute that defendant PCO is not a "peace officer" and has no authority either to arrest or issue moving violations. Defendant is authorized to use limited force during the performance of his duties namely, to use City-issued pepper spray as a means of self-defense. Defendant PCO had also been issued a uniform that indicated his affiliation with the San Francisco Municipal Transit Authority and not the San Francisco Police Department ("SFPD").

On May 6, 2008, defendant PCO was in uniform and on-duty patrolling the streets of San Francisco. Plaintiff and defendant PCO encountered each other while they were in their respective vehicles: plaintiff in his Lincoln Town Car and defendant PCO in his City-issued Geo Metro Compact Sedan. As plaintiff made a right turn from Eddy Street onto Franklin Street, defendant PCO honked his horn. After plaintiff turned, defendant PCO drew even with plaintiff's car and the two men argued about plaintiff's driving. Defendant PCO also made hand gestures at plaintiff. At a subsequent red light, while seated in their respective cars, both individuals continued to argue loudly.

Shortly after this exchange, approximately nineteen (19) blocks north of Eddy Street, plaintiff turned left from Franklin Street onto Greenwich Street. Defendant PCO followed him. Without being asked to stop, plaintiff stopped his car in the middle of Greenwich Street, so that he was double-parked. Defendant pulled up behind plaintiff, turned on the flashing yellow light located on top of his City-issued Geo Metro and honked his horn at plaintiff. Both plaintiff and defendant PCO exited their vehicles and approached one another. Defendant PCO began writing plaintiff a ticket for double-parking, and again, the two men shouted obscenities, insults and threats. Defendant PCO also allegedly aimed his City-issued canister of pepper spray at plaintiff. Plaintiff returned to his vehicle and called the police for assistance. The police arrived and diffused the scene. The two men left the area, but not before the police delivered plaintiff the parking ticket, written by defendant PCO, for being double-parked. Plaintiff paid this ticket in full.

A few hours later, plaintiff walked into the Fillmore Street entrance of the KFC/Taco Bell restaurant located at 2101 Lombard Street, on the corner of Fillmore and Lombard streets.

2

1  Unbeknownst to plaintiff, defendant PCO was at the same restaurant. After plaintiff noticed
2  defendant PCO, the two again exchanged words and plaintiff turned to leave. Defendant PCO
3  followed plaintiff out of the restaurant through the Lombard Street exit and began pepper spraying
4  plaintiff on the sidewalk. Defendant PCO does not claim that the pepper spray was used in self-
5  defense. Plaintiff then spat at defendant PCO. Defendant PCO subsequently punched plaintiff once
6  in the back of the head.

7  The physical altercation that took place outside the KFC/Taco Bell was visible to bystanders.
8  One such bystander, Erik Reinertson, a member of the California bar, submitted a declaration
9  corroborating many of these events. Specifically, Reinertson testifies that defendant PCO punched
10 plaintiff in the face as plaintiff was backing away. Thereafter, defendant PCO continued to follow
11 plaintiff as plaintiff backed away. After being punched, plaintiff crossed the street, stood next to
12 Reinertson and showed Reinertson the pepper spray residue on his face and glasses.

13 At this point, plaintiff again called the police, who took statements from multiple individuals.
14 Thereafter, the police arrested plaintiff for a violation of California Penal Code section 241(b).[1] All
15 charges were later dropped.

16 II.   Procedural Background

17 Plaintiff first filed this action in San Francisco County Superior Court, and on April 23,
18 2009, defendants removed the action to this court. Plaintiff alleged assault, battery, intentional
19 infliction of emotional distress, negligent hiring/retention and violations of civil rights under 42
20 U.S.C. section 1983. On February 16, 2010, defendants moved for partial summary judgment as to
21 plaintiff's section 1983 claims, arguing that Georgopoulos was not acting under color of state law as
22 required by section 1983. The court denied defendants' motion, declining to conclude as a matter of
23 law that Georgopoulos was not acting under color of state law.

24 On October 5, 2010, plaintiff filed a First Amended Complaint ("FAC"), adding a cause of
25 action under Cal. Civ. Code section 52.1 and eliminating his claims of intentional infliction of
26 emotional distress and negligent hiring/retention. *See* Docket No. 61 (FAC). Defendants now bring
27 a second motion for partial summary judgment, arguing that defendants did not violate plaintiff's

3

right to free speech, plaintiff's fourth amendment rights against excessive force, unlawful arrest and malicious prosecution or plaintiff's fourteenth amendment rights. Defendants also argue that plaintiff may sustain neither his section 52.1 claim nor his prayer for punitive damages.

LEGAL STANDARD

Summary judgment may be granted only when, drawing all inferences and resolving all doubts in favor of the non-moving party, there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); *see generally Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-55 (1986). A fact is "material" if it may affect the outcome of the proceedings, and an issue of material fact is "genuine" if the evidence is such that a reasonable jury could return a verdict for the non-moving party. *Id.* at 248. The court may not make credibility determinations. *Id.* at 255. The moving party bears the burden of identifying those portions of the pleadings, discovery and affidavits that demonstrate the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Once the moving party meets its initial burden, the non-moving party must go beyond the pleadings and, by its own affidavits or discovery, set forth specific facts showing that there is a genuine issue for trial. Fed R. Civ. P. 56(c); *see Anderson*, 477 U.S. at 250.

DISCUSSION

I.  Free Speech Claims

Defendants argue that plaintiff used only "fighting words" that generally are not accorded First Amendment protection. "To characterize speech as actionable 'fighting words,' the government must prove that there existed 'a likelihood that the person addressed would make an immediate violent response.'" *United States v. Poocha*, 259 F.3d 1077, 1080-81 (9th Cir. 2001). "In light of our 'profound national commitment to the principle that debate on public issues shall be uninhibited, robust, and wide-open, and that it may well include vehement, caustic, and sometimes unpleasantly sharp attacks on government and public officials,' the area of speech unprotected as

4

United States District Court
For the Northern District of California

1 fighting words is at its narrowest, if indeed it exists at all, with respect to criminal prosecution for
2 speech directed at public officials." *Id.* (quoting *New York Times Co. v. Sullivan*, 376 U.S. 254, 270
3 (1964)).

4       Defendants argue that "[p]laintiff's only speech was to insult and curse at Georgopoulos",
5 Docket No. 101 (Defendants' Motion) at 9:3-4, and that because plaintiff's words were "inherently
6 likely to provoke violent reaction" from Georgopoulos, plaintiff's words should not be accorded
7 First Amendment protection. *Id.* (quoting *Cohen v. California*, 403 U.S. 15 (1971)). Plaintiff,
8 however, proffers evidence that although plaintiff insulted and cursed at Georgopoulos, he did so at
9 least in part as a criticism of the manner in which Georgopoulos conducted his official duties as a
10 parking officer. *See*, *e.g.*, Docket No. 111-4 (Williams Depo.) at 68. In addition, plaintiff proffers
11 evidence that plaintiff walked away from Georgopoulos in the KFC/Taco Bell as well as attempted
12 to escape from Georgopoulos while Georgopoulos pepper sprayed then punched plaintiff,
13 contradicting defendants' assertion that plaintiff threatened and challenged Georgopolous to a fight
14 in conjunction with uttering fighting words.[2] Viewing the evidence in the light most favorable to
15 plaintiff, there is a genuine issue of material fact whether at least some portion of plaintiff's speech
16 contained a criticism of Georgopoulos' unprofessional behavior and what plaintiff perceived to be
17 Georgopoulos' issuance of an unwarranted parking ticket out of spite, anger or retaliation.
18 Additionally, the finder of fact could reasonably conclude that plaintiff's speech was not "coupled
19 with a threat to fight", Defendants' Motion at 3:9-10, but that Georgopoulos was the instigator, and
20 in fact the only perpetrator, of the violence that occurred.

21       Nor is the fact that plaintiff used expletives itself dispositive. In *Poocha*, National Park
22 Service rangers attempted to arrest an individual in Yosemite National Park, and a group of
23 spectators, including Poocha, formed to observe. 259 F.3d at 1078. Upset by what he perceived as
24 unwarranted official action, Poocha, among others, began to shout obscenities at the rangers. *Id.* A
25 ranger approached Poocha and ordered him to back away from the official action and to leave.
26 According to the ranger, in response Poocha shouted, "fuck you" and other profanities while

5

clenching his fists and sticking out his chest. *Id.* at 1079. Poocha was charged with and convicted of disorderly conduct in violation of federal law. *Id.*

On appeal, the Ninth Circuit considered the lawfulness of the arrest of Poocha in light of the First Amendment. The court determined that "Poocha used profanity to express his disapproval of an officer's conduct. Criticism of the police, profane or otherwise, is not a crime." *Id.* at 1082 ("We have repeatedly emphasized that while police, no less than anyone else, may resent having obscene words and gestures directed at them, they may not exercise the awesome power at their disposal to punish individuals for conduct that is not merely lawful, but protected by the First Amendment." (internal quotation marks and citation omitted)). Concluding that "the natural import of his speech was an expression of criticism of the police, not an incitement of the crowd to act," the Ninth Circuit held that the speech at issue, expletives and all, was constitutionally protected. *Id.* Here, the finder of fact could reasonably conclude that the essence of at least some portion of plaintiff's profane speech was rooted in criticism of Georgopoulos in his official capacity, and that it was unreasonable for Georgopoulos to react by assaulting plaintiff with his City-issued pepper spray.

In further support of the notion that plaintiff's sole intent was to insult and not criticize, however, defendants point to evidence that plaintiff expressed such sentiments as "get a real job," questioned Georgopoulos' authority to issue a violation and used expletives directed at Georgopoulos. *See, e.g.*, Docket No. 102-1 (Abudiab Depo.) at 37:23-41:9-13. Viewing the facts in the light most favorable to plaintiff, however, the finder of fact could reasonably infer that criticism of Georgopoulos in his official capacity was implicit in these statements, and that because the interaction stemmed from conduct that Georgopoulos engaged in in his official capacity while acting under color of state law, plaintiff's speech, although profane, was directed toward that official conduct and not in fact personal. Indeed, the finder of fact could reasonably conclude that the speech was firmly rooted in criticism of official conduct, even though "unpleasant" and "tasteless" in nature. *Id.* Moreover, consistent with *Poocha*, the finder of fact could reasonably conclude that as a public official whose duties often incite the vitriol of the public, and who consequently is authorized to use force against members of the public (deployment of pepper spray in self-defense),

6

Georgopoulos should be held to a higher standard of conduct in terms of his reaction to mere criticisms, profane and otherwise, of the manner in which he conducts his official duties.

Defendants next argue that even if plaintiff's speech was protected, plaintiff is unable to establish that "Georgopoulos took action against plaintiff because of his speech." Defendants' Motion at 9:9-10. Defendants argue that Georgopoulos "did not hit or pepper spray [p]laintiff because of the content of plaintiff's speech" but because plaintiff "sought out and then aggressively approached Georgopoulos in the restaurant." *Id.* at 9:25-10:1. Plaintiff, however, offers evidence to support the contrary conclusion. *See* Docket No. 103 (Georgopoulos Dec.), Exh. A (Surveillance Video). The surveillance video shows plaintiff walking up to Georgopoulos, saying something very briefly, then walking away from Georgopoulos out the door. *Id.* Williams, a witness to the interaction between Georgopoulos and plaintiff in the KFC/Taco Bell, testified that plaintiff spoke angrily to Georgopoulos about the parking ticket, but did not appear to touch Georgopoulos and then turned and walked away from Georgopoulos. Williams Depo. at 68. The video shows Georgopoulos following plaintiff out the door and appearing to reach for something on his utility belt. *Id.* Plaintiff argues that the video reflects that plaintiff directed a brief expletive toward Georgopoulos in order to continue the expression of his critique of Georgopoulos' issuance of an unwarranted parking citation and then turned to leave. Plaintiff further contends that Georgopoulos consequently followed plaintiff outside the restaurant and assaulted plaintiff with pepper spray and his fists in retaliation for plaintiff's criticisms.

Defendants characterize this interaction in a completely different fashion, explaining that the video shows plaintiff physically threatening Georgopoulos. Defendants contend that Georgopoulos merely directed plaintiff outside to protect the patrons of the KFC/Taco Bell from plaintiff's alleged violent intentions. Viewing the evidence in the light most favorable to plaintiff, however, a genuine issue of material fact exists as to whether Georgopoulos retaliated against plaintiff on account of plaintiff's critical speech.

Lastly, defendants argue that Georgopoulos is entitled to qualified immunity. "A finding of qualified immunity depends on a two-part inquiry by the court." *Peng v. Mei Chin Penghu*, 335 F.3d

7

1  970, 976 (9th Cir. 2003) (citing *Saucier v. Katz*, 533 U.S. 194, 201 (2001) overruled on other
2  grounds by *Pearson v. Callahan*, 555 U.S. 223 (2009)). The court must determine whether the facts
3  alleged, "taken in the light most favorable to the party asserting the injury," show the violation of a
4  constitutional right, and whether the right was clearly established at the time of the violation. *Id*; *see*
5  *Blankenhorn v. City of Orange*, 485 F.3d 463, 471 (9th Cir. 2007) (citing *Beier v. City of Lewiston*,
6  354 F.3d 1058, 1064 (9th Cir. 2004) ("Defendants are entitled to such relief only if the facts alleged
7  and evidence submitted . . . show that their conduct did not violate a federal right; or, if it did, the
8  scope of that right was not clearly established at the time.")).

9  Having determined above that the trier of fact could reasonably conclude that a constitutional
10 violation occurred, the court must determine whether the law was clearly established. Defendants
11 first argue that there was no existing precedent stating that parking enforcement officers such as
12 Georgopoulos "should be treated *like* peace officers in determining whether words are 'fighting
13 words' under the First Amendment." Defendants' Motion at 11:12-13. Whether speech is deemed to
14 be "fighting words" for the purposes of First Amendment protection does not rest upon whether the
15 listener is a peace officer rather than a parking officer, but rather whether the speech is likely to
16 incite immediate violence. Peace officers are merely subjected to higher standard in terms of
17 whether speech may incite them to "exercise the awesome power at their disposal to punish
18 individuals for conduct that is not merely lawful, but protected by the First Amendment." *Poocha*,
19 259 F.3d at 1082. Whether words are "fighting" goes to the issue of whether the speech to begin
20 with is eligible for First Amendment protections, and as stated above, here there is a genuine issue of
21 material fact whether plaintiff's speech, although profane, was "fighting" or rooted in criticism. *See*
22 *Skoog v. County of Clackamas*, 469 F.3d 1221, 1232 (9th Cir. 2006) (quoting *Mendocino Envtl. Ctr.*
23 *v. Mendocino Cty.*, 192 F.3d 1283, 1300 (9th Cir.1999) (What is relevant is whether the speaker is
24 engaging in critical speech protected under the Constitution and whether the purported retaliatory
25 acts "'would chill or silence a person of ordinary firmness from future First Amendment
26 activities.'")).

8

"When considering the qualified immunity defense in the retaliation context, courts must strike an appropriate balance between protecting First Amendment rights, on the one hand, and protecting *government officials* from the disruption caused by unfounded claims, on the other." *Id.* (emphasis added). As reflected above, viewing the facts in the light most favorable to plaintiff, the trier of fact could reasonably conclude that plaintiff's speech was a protected criticism of Georgopoulos as he acted in his official capacity and directly related to what plaintiff perceived to be the unfair issuance of a parking citation. The finder of fact could similarly conclude that Georgopoulos' violent actions would chill or silence future legitimate criticisms of parking officers' activities, and it was well-established at the time of the incident that retaliation for such speech, engaged in by an individual acting under color of state law, would not comport with the law. *See*, *e.g.*, *Soranno's Gasco, Inc. v. Morgan*, 874 F.2d 1310, 1314 (9th Cir. 1989) ("Deliberate retaliation by state actors against an individual's exercise [First Amendment rights] is actionable under section 1983.") Accordingly, defendants' motion for summary judgment as to this claim is DENIED.

II.     Fourth Amendment Claims

   A.   Excessive Force

Plaintiff alleges that Georgopoulos used excessive force, in violation of the Fourth Amendment, by repeatedly spraying plaintiff with pepper spray and by punching plaintiff in the back of the head. Defendants argue that plaintiff's claim should be analyzed under the Fourteenth Amendment instead of the Fourth Amendment because for claims of excessive force against a government actor who lacks the authority to use force, the proper avenue for relief is the Fourteenth Amendment. Defendants' Motion at 12:18-19. Defendants concede, however, that Georgopoulos was in fact authorized to use limited force against the public. Defendants do not dispute that the City issued pepper spray to Georgopoulos and authorized its use in instances of self-defense during the course of his employment as a parking officer. Thus, by the defendants' own argument, plaintiff's claim is properly analyzed under the Fourth Amendment, especially as the excessive force alleged by plaintiff is exactly the force that Georgopoulos was authorized to use: pepper spray deployment.

9

Defendants also seek to convince the court that because PCOs are not peace officers, they are categorically not law enforcement officers, and the Fourth Amendment's proscription against excessive force may never apply to them. California Penal Code section 830.1 defines a peace officer and excludes parking officers. State law, however, does not similarly define a "law enforcement officer" in such an exclusive manner. Rather, review of state case law as well as the City's own municipal code reveals that state courts and the municipal code have not adopted such a limited view of which state actors may qualify as law enforcement officers, but rather have concluded that, based on a varying set of facts, some non-peace officer state actors are in fact law enforcement officers. In short, contrary to defendants' arguments, while all peace officers are law enforcement officers, not all law enforcement officers are peace officers.

For example, in *Sims v. Superior Court*, 18 Cal.App.4th 463 (1993), the state Court of Appeal considered whether a Franchise Tax Board investigator was a law enforcement officer for the purposes of offering evidence pursuant to California Penal Code section 872(d), which limits hearsay evidence to law enforcement officers. The court noted that the "omission" of this type of investigator from the statute defining peace officers, and thus law enforcement officers, was "not determinative." *Id.* at 469. "[R]ather, the critical inquiry is whether [the investigator's] qualifications and duties are commensurate with those of individuals upon whom the Legislature has, for whatever reason, conferred 'peace officer' status." *Id.* The court concluded that in this context, a law enforcement officer was not limited to "'traditional' law enforcement officers authorized to carry weapons and make arrests, but rather is intended to encompass officers and agents with knowledge of the pertinent laws underlying the charged crime who can provide meaningful testimony at preliminary hearings." *Id.* at 465. Accordingly, the term law enforcement officer "applie[d] to officers and agents employed by a federal, state or local government agency: 1) who meet the threshold training and experience requirements set forth in [section 827]; and 2) whose primary responsibility is to investigate and prepare for prosecution cases involving violations of laws." *Id.*; *see also*, *People v. Frontier Pacific Ins. Co.*, 69 Cal.App 4th 1093, 1098 (1999) ("Thus, the courts in both *Martin*[*v. Superior Court*, 230 Cal.App.3d 11921 (1991)] and *Sims* concluded that

10

the key to determining whether or not an individual is a law enforcement officer is if his or her primary duty is the enforcement of the law.").

In addition, several places in the municipal code call into question defendants' assertion that only peace officers are law enforcement officers. For example, the San Francisco Administrative Code, with respect to its Policy Making Marijuana Offenses the Lowest Law Enforcement Priority, states that a "'San Francisco law enforcement officer' means any peace officer employed by the City and County of San Francisco, *and any other employee of the City and County who is authorized to engage in law enforcement activity*." S.F. Admin. Code § 12X.4(b) (emphasis added). With respect to the Building Code, "building officials" are granted the powers of a law enforcement officer. Section 89.124 states, "[t]he Building Official is hereby authorized and directed to enforce all the provisions of this code. For such purposes, *the Building Official shall have the powers of a law enforcement officer.* The Building Official, when necessary, may call upon the Police Department and other city agencies for aid or assistance in carrying out or enforcing any of the provisions of this code." S.F. Building Inspection Commission Codes § 89.124(A).

While neither the cases nor the code sections cited definitively characterize PCOs as law enforcement officers, they do suggest that whether a government actor, such as a PCO, is a law enforcement officer is dependant largely on whether the primary duty of the actor in question is to enforce the laws of the jurisdiction or the laws as duly enacted by the legislature. With respect to PCOs, San Francisco Transportation Code section 1.1(b)(15) defines a PCO as, "[a] City employee *authorized by the Municipal Transportation Agency to enforce state laws and the San Francisco Transportation Code* related to Parking of vehicles." (emphasis added). From the plain language of the Code, it appears that law enforcement is the primary duty of a PCO. Moreover, in enforcing the City's traffic laws, Georgopoulos, and other PCOs, were authorized to use force against the public as reflected by the City's issuance of pepper spray for use in self-defense. *See* Docket No. 111-1 (Georgopoulos Depo.) at 46. Accordingly, the court concludes that Georgopoulos was indeed a law enforcement officer because his primary duty was the enforcement of the City's traffic laws, and

11

because viewing the facts in favor of plaintiff, the finder of fact could reasonably conclude while acting under that under color of state law, Georgopoulos used unreasonable force against plaintiff.

Defendants argue that even if a constitutional violation occurred, Georgopoulos is entitled to qualified immunity because no parking officer has previously been held to account for violating the Fourth Amendment's prohibition against excessive force. Accordingly, defendants argue that a parking officer in Georgopoulos' position could not have reasonably believed that using unreasonable force while acting under color of state law was violative of the Fourth Amendment. Plaintiff, in opposition, makes no argument with respect to defendants' claim of qualified immunity, cites to no authority that would support the notion that the law was clearly established and therefore appears to concede that Georgopoulos is entitled to qualified immunity as to this claim.[3] Accordingly, summary judgment is GRANTED in favor of defendants.

### B.   Unlawful Arrest

Defendants argue that plaintiff's claim of unlawful arrest may not stand. In opposition, plaintiff makes no argument with respect to this claim. Accordingly, summary judgment is GRANTED in favor of defendants.

### C.   Malicious Prosecution

Plaintiff bases his claim of malicious prosecution solely on a violation of section 1983 and does not allege a state law-based claim of malicious prosecution. In considering this claim, however, the court factors into its analysis the state common law tort of malicious prosecution because the state standard is incorporated into the federal standard. *Awabdy v. City of Adelanto*, 368 F.3d 1062, 1066 (9th Cir. 2004).

> In order to prevail on a § 1983 claim of malicious prosecution, a plaintiff must show that the defendants prosecuted [him] with malice and without probable cause, and that they did so for the purpose of denying [him] equal protection or another specific constitutional right. Malicious prosecution actions are not limited to suits against prosecutors but may be brought, as here, against other persons who have wrongfully caused the charges to be filed. *Id.* (internal quotation marks and citations omitted).

"To prove a claim of malicious prosecution in California, the plaintiff must prove that the underlying prosecution: '(1) was commenced by or at the direction of the defendant and was pursued to a legal

12

termination in his, plaintiff's, favor; (2) was brought without probable cause; and (3) was initiated with malice.'" *Conrad v. United States*, 447 F.3d 760, 767 (9th Cir. 2006) (quoting *Sheldon Appel Co. v. Albert & Oliker*, 47 Cal.3d 863 (1989)).

Defendants' argument that Georgopoulos may only be held liable for malicious prosecution if he was a willful participant in joint action with the state or its agents incorporates the standard by which a private individual may be held liable under section 1983. *See*, *e.g.*, *Franklin v. Fox*, 312 F.3d 423, 441 (9th Cir. 2002) ("A private individual may be liable under § 1983 if she conspired or entered joint action with a state actor."). As the court previously determined in denying defendants' first motion for partial summary judgment however, Georgopoulos has not demonstrated that, as a matter of law, he was not acting under color of state law, and thus properly treated here as a private individual. And, "[a] plaintiff may bring an action under 42 U.S.C. § 1983 to redress violations of his rights, privileges, or immunities secured by the Constitution and [federal] laws by a person or entity, including a municipality, acting under the color of state law." *Awabdy*, 368 F.3d at 1066 (internal quotation marks and citations omitted). Resolving the evidence in favor of plaintiff, Georgopoulos acted under color of state law and plaintiff need not show a conspiracy in order to hold Georgopoulos liable for malicious prosecution under section 1983. Additionally, the evidence reflects that the SFPD relied at least in part on Georgopoulos' testimony in arresting plaintiff for battery on a parking control officer. *See* Docket No. 105 (Jou Dec.) ¶¶ 4,10. Viewing the evidence in the light most favorable to plaintiff, the finder of fact could reasonably infer that plaintiff did not offensively touch Georgopoulos and that Georgopoulos lied to the SFPD for the purpose of having plaintiff arrested.

Finally, defendants argue that Georgopoulos is entitled to qualified immunity because no parking officer could know that he could be held liable for malicious prosecution absent some conspiracy or joint action with police. Again, defendants misstate the standard by which Georgopoulos, should he be found to have acted under color of state law, may be liable for malicious prosecution under section 1983. The Ninth Circuit has stated that "[m]alicious prosecution actions . . . may be brought, as here, against other persons who have wrongfully caused the charges to be

13

filed." *Awabdy*, 368 F.3d at 1066 (citing *Galbraith v. County of Santa Clara*, 307 F.3d 1119, 1126-27 (9th Cir.2002)). Indeed, defendants cite to no authority for their contention that non-peace officers (even non-peace offices who are acting under color of state law) may not "violate [section] 1983 without conspiring with the police or the prosecution." Docket No. 129 (Defendants' Reply) at 12:23-24. Rather, in the Ninth Circuit, plaintiff may "maintain[] his § 1983 malicious prosecution claim if he is able to prove the allegations in his complaint that the criminal proceedings were initiated on the basis of [Georgopoulos'] intentional and knowingly false accusations and other malicious conduct." *Awabdy*, 368 F.3d at 1067. Here, defendants do not dispute that the SFPD relied at least in part on Georgopoulos' account of the events in determining that there was probable cause to arrest Abudiab for battery on a PCO. Accordingly, Georgopoulos is not entitled to qualified immunity because per *Awabdy*, it was clearly established that non-peace officers could be held liable for malicious prosecution where a "*state or local official*[] . . . engaged in wrongful or bad faith conduct that was actively instrumental in causing the initiation of legal proceedings." *Id.* (emphasis added). Accordingly, defendants' motion for summary judgment is DENIED.

III.     Fourteenth Amendment Claims

As determined above, plaintiff's claim stemming from Georgopoulos' use of force against him is properly analyzed under the Fourth Amendment. Plaintiff argues that Georgopoulos' actions should only be analyzed under the Fourteenth Amendment as an alternative to their analysis under the Fourth Amendment. Because the court considered Georgopoulos' use of force under the Fourth Amendment, the court does not analyze Georgopoulos' actions a second time under the Fourteenth Amendment.

IV.     Section 52.1 Claims

Plaintiff alleges that Georgopoulos violated California Civil Code section 52.1 by using violence to deprive him of his Fourth Amendment and First Amendment rights. Section 52.1 provides for damages if a person "interferes by threats, intimidation, or coercion, or attempts to interfere by threats, intimidation, or coercion, with the exercise or enjoyment by any individual or individuals of rights secured by the Constitution or laws of the United States, or of the rights secured

14

by the Constitution or laws of this state, the Attorney General, or any district attorney or city attorney . . . " Cal. Civ.Code § 52.1(a). "[S]ection 52.1 [requires] an attempted or completed act of interference with a legal right, accompanied by a form of coercion." *Jones v. Kmart Corp.*, 17 Cal.4th 329, 333 (1998). As reflected above, there is a genuine issue of material fact whether Georgopoulos retaliated against plaintiff, by using unreasonable force, for plaintiff's criticisms of Georgopoulos. Accordingly, defendants' argument that plaintiff does not have a valid First Amendment claim to support a section 52.1 claim is unavailing.

Defendants next argue that plaintiff's section 52.1 claim, as predicated on a First Amendment violation, may not stand because plaintiff failed to state facts to support such a violation in his government claim. Specifically, defendants argue that per California Government Code section 945.4, plaintiff's claim is invalid. Section 945.4 states:

> Except as provided in Sections 946.4 and 946.6, no suit for money or damages may be brought against a *public entity* on a cause of action for which a claim is required to be presented in accordance with Chapter 1 (commencing with Section 900) and Chapter 2 (commencing with Section 910) of Part 3 of this division until a written claim therefor has been presented to the public entity and has been acted upon by the board, or has been deemed to have been rejected by the board, in accordance with Chapters 1 and 2 of Part 3 of this division. (emphasis added).

By its own terms, section 945.4 applies to claims against a public agency and does not appear to apply to claims against individuals. Accordingly, to the extent that this claim is made against the City, it cannot stand. However, to the extent that it is brought against Georgopoulos in his individual capacity, the fact that the government claim does not include specific facts supporting a section 52.1 violation predicated upon Georgopoulos' alleged use of violence to retaliate against plaintiff's criticisms of him does not defeat the claim.[4]

Plaintiff's section 52.1 claims, as predicated on the alleged violations of the Fourth Amendment, may also stand because there are genuine issues of material fact whether Georgopoulos interfered with plaintiff's Fourth Amendment rights by use of threats, intimidation or coercion. *See Venegas v. County of Los Angeles*, 153 Cal.App.4th 1230, 1247 (2007). Accordingly, defendants' motion is GRANTED in part and DENIED in part.

V.   Punitive Damages

15

Under federal law, "oppressive conduct is a proper predicate for punitive damages under § 1983." *Dang v. Cross*, 422 F.3d 800, 809 (9th Cir. 2005). "The plaintiff has the burden of proving that punitive damages should be awarded, and the amount, by a preponderance of the evidence." *Id.* at 206. "Under California law, punitive damages are appropriate where a plaintiff establishes by clear and convincing evidence that the defendant is guilty of (1) fraud, (2) oppression or (3) malice. Cal. Civ.Code § 3294(a). According to the definitions provided in section 3294(c), a plaintiff may not recover punitive damages unless the defendant acted with intent or engaged in despicable conduct. The adjective 'despicable' connotes conduct that is so vile, base, contemptible, miserable, wretched or loathsome that it would be looked down upon and despised by ordinary decent people." *In re First Alliance Mortg. Co.*, 471 F.3d 977, 998 (9th Cir. 2006) (quoting *Lackner v. North*, 135 Cal.App.4th 1188 (2006) (internal quotation marks omitted). Here, the nature of the altercation between Georgopoulos and plaintiff, including its origins, presents genuine issues of material fact. Accordingly, the court may not conclude as a matter of law that Georgopoulos' actions were neither oppressive, malicious nor despicable. Accordingly, summary judgment as to this claim is DENIED.

VI.  *Monell* Claims

Lastly, defendants argue that any claims that plaintiff maintains against the City that are predicated on violations of section 1983 may not stand. Plaintiff in opposition makes no argument to the contrary. Accordingly, defendants' motion for summary judgment is GRANTED.

CONCLUSION

Defendants' motion for partial summary judgment is GRANTED in part and DENIED in part as follows: defendants' motion for partial summary judgment as to plaintiff's First Amendment claim, Fourth Amendment malicious prosecution claim, California Civil Code section 52.1 claim (as alleged against Georgopoulos in his individual capacity) and punitive damages claim is DENIED. Defendants' motion for summary judgment as to plaintiff's remaining Fourth Amendment claims, Fourteenth Amendment claim, *Monell* claim and California Civil Code section 52.1 claim (as alleged against the City) is GRANTED.

IT IS SO ORDERED.

Dated: June 17, 2011

MARILYN HALL PATEL
United States District Court Judge
Northern District of California

**ENDNOTES**

1.    Section 241(b) states:

> When an assault is committed against the person of a parking control officer engaged in the performance of his or her duties, and the person committing the offense knows or reasonably should know that the victim is a parking control officer, the assault is punishable by a fine not exceeding two thousand dollars ($2,000), or by imprisonment in the county jail not exceeding six months, or by both the fine and imprisonment.

2.    Defendants argue that the higher standard of restraint applied to police officers in the face of "fighting words" does not apply here because Georgopoulos was not a peace officer. For the reasons set forth herein the court rejects defendants' contention that Georgopoulos was not a peace officer. Even so, considering the general standard applied to the average person, there is a question of material fact whether plaintiff's words were in fact fighting words -- that is to say whether they were sufficient to incite Georgopoulos' violent response.

3.    In light of the Court's recent decision in *Al-Kidd v. Ashcroft*, _S.Ct._ (2011), 2011 WL 2119220, it is uncertain whether plaintiff would be able to establish that a reasonable parking officer would have understood his actions here to be violative of the Fourth Amendment.

4.    Defendants rely on *Fall River Joint Unified School Dist. v. Superior Court*, 206 Cal.App.3d 431 (1988) to support their argument that section 945.4 bars plaintiff's claim here. The court in *Fall River* makes no mention of section 945.4 as a limitation on claims brought against public officials in their individual capacity.